# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARIN L. THOMASON,<br><br>        Plaintiff,<br><br>        v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>        Defendant. | Case No. 1:16-cv-01013-AWI-SAB<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 18, 19, 20)<br><br>OBJECTIONS DUE WITHIN FOURTEEN DAYS |

## I.

## INTRODUCTION

Plaintiff Darin L. Thomason ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter was referred to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.

Plaintiff suffers from alcohol abuse in remission, status-post left lower extremity fracture with a history of open reduction internal fixation of his left ankle, hearing loss, seizure disorder, traumatic brain injury, organic mental disorder, and affective disorder. For the reasons set forth

below, the Court recommends that Plaintiff's Social Security appeal be denied and Defendant's cross-motion for summary judgment be granted.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on January 12, 2012. (AR 84.) Plaintiff's application was initially denied on June 12, 2012, and denied upon reconsideration on June 14, 2013. (AR 139-143, 145-149.) Plaintiff requested and received a hearing before Administrative Law Judge Vincent Misenti ("the ALJ"). Plaintiff appeared for a hearing on September 9, 2014. (AR 41-83.) On November 26, 2014, the ALJ found that Plaintiff was not disabled. (AR 19-35.) The Appeals Council denied Plaintiff's request for review on May 9, 2016. (AR 1-4.)

### A.     Hearing Testimony

Plaintiff testified at a hearing on September 9, 2014. (AR 45-71, 78-82.) Plaintiff lives in a house with his girlfriend, Nancy Cunningham and her seventeen year old daughter. (AR 81-82.) When Plaintiff needs to go somewhere he gets a ride from Nancy, his sister, or his mother. (AR 82.) Plaintiff received a head injury when he fell 13 to 14 feet from a second story balcony. (AR 64.) He was not at work. (AR 64.) Plaintiff landed on his head and received eight staples in the back of his head and his whole face was bruised. (AR 65.)

Plaintiff has worked since the alleged date of onset of his disability. (AR 45.) In 2010, Plaintiff went back to work because his doctors told him that he could. (AR 45.) Plaintiff earned $12,395 in 2010 working in construction. (AR 45-46.) Plaintiff worked as a carpenter/foreman, working 8 hours a day in the carpenter position or 9 hours when he worked as foreman. (AR 46.) Plaintiff worked Monday through Friday and carried 60 or more pounds on average. (AR 46.) Plaintiff would be walking all day and climbing. (AR 47.) Plaintiff used power tools, saws, skill saws, and saws-all. (AR 47.) Plaintiff stopped working because there was no more work. (AR 47.)

Plaintiff went back to the same employer in 2011 and earned $9,596 in three months doing the same job. (AR 47.) Plaintiff had a seizure that year, although he stopped working

because there was no more work.  (AR 48.)  Plaintiff's employer was aware that Plaintiff had a seizure because the employer found him in a flower bed of the church that they were remodeling.  (AR 64.)  Plaintiff tried to go back to work for the employer but was required to get a doctor's release.  (AR 64.)  Plaintiff was given a doctor's release to go back to work six months later.  (AR 64.)  Plaintiff's standard wage was about $26 per hour. (AR 49.)  Plaintiff was paid well and, while he did not always like the people he worked with, he loved his job.  (AR 66.)

Plaintiff's memory, balance, and coordination have not been the same since his fall.  (AR 65.)  Plaintiff reads the paper in the morning and then again in the afternoon.  (AR 66.)  Plaintiff will read for about thirty minutes.  (AR 66.)  Plaintiff does not always remember what he has read.  (AR 66.)  Plaintiff has small seizures that he can remember every day.  (AR 50.)  Sometimes he can feel the seizure coming on and sometimes he cannot.  (AR 50.)  When he feels a seizure coming on his neurologist has told him to lie on the floor on his side.  (AR 50.)  Plaintiff has had a broken ankle.  (AR 50.)  During the past twelve months, he has had four to five seizures a week.  (AR 50-51.)  Plaintiff is unsure how many seizures he was having prior to the last twelve months.  (AR 51.)

When Plaintiff has a small seizure he feels his body temperature rise, his hands start to shake so that he cannot hold onto anything, and he feels like he is drowning.  (AR 51.)  Plaintiff has fallen down and walked into doors and walls.  (AR 51.)  Plaintiff stopped riding his bike because he rode into a parked car.  (AR 51.)  When he has a seizure he lies down until he feels stable enough to get up.  (AR 51-52.)  That can take 30 to 45 minutes or an hour and a half.  (AR 52.)  Sometimes he has a seizure and does not remember anything.  (AR 52.)  Plaintiff can remember looking at the clock at 9:00 and it will be 11:30 and he does not remember anything that happened in between.  (AR 52.)  Plaintiff will wake up and his pants will be all wet and he will know that he had a seizure.  (AR 52.)  On two occasions, Plaintiff remembers having warning that he was going to have a seizure.  (AR 52.)  When Plaintiff has a seizure he will bite his tongue or cheek and pee his pants.  (AR 70.)  He has split his forehead open.  (AR 70.)

When Plaintiff feels like he is going to have a seizure, he will lie down on his side keeping his back to something so he does not swallow his tongue.  (AR 52.)  Plaintiff has been

unconscious quite often. (AR 53.) Plaintiff has been to the emergency room for a seizure but mostly stays out because he does not want to tell his doctor he has seizures because he hopes to get his driver's license back again. (AR 53.) Plaintiff last went to the emergency room on Memorial Day. (AR 53.) Plaintiff has lost a whole week of his memory. (AR 54.) He ended up in the emergency room and they had to pump out his lungs. (AR 54.)

Plaintiff takes his medication in the morning when he wakes up and again at night. (AR 54-55.) When asked about notations in the record that he has not been complaint with his medication, Plaintiff said he has forgotten his medication one time. (AR 55.)

Plaintiff had a drinking problem because he had a death wish. (AR 55.) Plaintiff was drinking a six pack a day. (AR 55.) He stopped drinking in 2012 and does not drink anymore. (AR 55.) Plaintiff stopped drinking in 2011 for a while, and was sober for six months. (AR 55.) Plaintiff was drinking three to six beers a day prior to that. (AR 55-56.) When asked about notations in the record that he was drinking 2 to 3 24 ounce cans and then a 6 pack a day, Plaintiff stated he was only thinking of the little cans and he was drinking three to six beers daily. (AR 56.) When pressed on how much he was actually drinking, Plaintiff became upset and never answered the question. (AR 56-58.) After he stopped drinking, his grand mal seizures got worse. (AR 58.)

Plaintiff gets up in the morning and makes a pot of coffee. (AR 59.) He has a cup and then lies back down. (AR 59.) When he wakes back up, his girlfriend is up and she reminds him to take his medicine. (AR 59.) Plaintiff helps out with the laundry, feeds and waters the cats, and walks down to the mailbox to get the mail. (AR 59-60.) He stopped doing dishes because he broke too many. (AR 59.) Plaintiff reads the newspaper or the Bible. (AR 60.) He will help his girlfriend if she asks for help. (AR 60.) Plaintiff will go outside and have a cigarette. (AR 61.)

Plaintiff has no hobbies now. (AR 60.) He used to do woodworking or go hunting. (AR 60.) Plaintiff will go grocery shopping. (AR 61.) Plaintiff does not drive because of his seizures. (AR 61.) Plaintiff has to be seizure free for six months before he can get his driver's license back. (AR 67.) Plaintiff has some DUIs. (AR 61.) Plaintiff does not walk outside when

it is hot because he has had seizures on the sidewalk or in his neighbor's yard.  (AR 62.)

Plaintiff takes his medication daily, but still has seizures during the day.  (AR 62-63.)  On his new medication, his seizures seem "easier" but he feels drowsy, like his batteries are gone.  (AR 63.)  Plaintiff said that he tried to get another job but from what he was told by people he knows in construction, Plaintiff believes that his employer stopped using him because Plaintiff became a liability to the employer's workman's comp.  (AR 63.)

Plaintiff's current treating neurologist is Dr. Chaudhry.  (AR 78.)  Plaintiff started seeing Dr. C Chaudhry after his last seizure.  (AR 78.)  Plaintiff has seen Dr. Chaudhry twice.  (AR 79.)  When he first saw Dr. Chaudhry, the doctor asked if Plaintiff was driving or working.  (AR 80.)  The doctor told him to get paperwork because he needed to be on disability.  (AR 80.)  Dr. Chaudhry criticized Dr. Yoshimura and is the first doctor to have sent Plaintiff for an MRI.  (AR 80.)

A vocational expert, Susan T. Moranda also testified at the hearing.  (AR 71-74.)

**B.     ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015.

- Plaintiff has not engaged in disqualifying substantial gainful activity since the alleged onset date of January 18, 2009.

- Plaintiff has the following severe impairments: seizure disorder, traumatic brain injury, organic mental disorder, and affective disorder.

- Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment.

- Plaintiff has the residual functional capacity to perform a full range of work at all exertion levels with the following limitations: he can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance; never operate moving mechanical parts, work around unprotected heights, or engage in commercial driving.  Plaintiff cannot work in or around alcohol

environments, defined as an environment in which alcohol is commercially sold or around the storing of alcohol. He can understand, remember, and carry out simple, routine and repetitive tasks using judgment limited to simple work-related decisions.

- Plaintiff is unable to perform any past relevant work;

- Plaintiff was born on June 30, 1971, and was 37 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled" whether or not he has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from January 12, 2012 through the date of decision.

(AR 24-35.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is

disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff argues that the ALJ erred in evaluating the opinions of physicians, Dr. Yoshimura, Dr. Chaudhry, Dr. Kirsten, and Dr. Portnoff, and the third party evidence. Defendant moves for summary judgment arguing the ALJ properly found Plaintiff not credible and considered this in addressing the physician opinions and provided germane reasons to reject the third party evidence. Plaintiff responds that Defendant's arguments are inadequate and lack merit.[1]

### A. The ALJ Provided Clear and Convincing Reasons to Find Plaintiff's Testimony Not Credible

Plaintiff discussed the finding that he was not credible in addressing the lay witness testimony. In the cross motion for summary judgment, Defendant argues that the ALJ properly found that Plaintiff's testimony was not credible.

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that his impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80

---

[1] In his reply, Plaintiff argues that the ALJ rejected the opinion of the consultative examiner that Plaintiff was limited to to performing a light range of work and instead found that Plaintiff had no exertional limitations. Since this issue was raised for the first time in the reply brief, and Defendant was not provided with an opportunity to address the issue, the Court declines to consider this argument. Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007).

F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of his symptoms by offering "clear and convincing reasons" for the adverse credibility finding. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

The ALJ found that Plaintiff's severe impairments could reasonably be expected to cause the alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (AR 28.) The ALJ stated that since Plaintiff's allegations of disability due to seizures were primarily based on subjective symptoms, Plaintiff's credibility was a material factor and considered his course of medical treatment, medication usage, and work history in making the credibility finding. (AR 31.)

The ALJ considered that although Plaintiff's work activity after June 9, 2009, did not constitute disqualifying substantial gainful activity, it did indicate that Plaintiff's daily activities, at least at times, were greater than he reported. (AR 31.) Plaintiff returned to work as a

carpenter in 2010 and earned more than $20,000 during 2010 and 2011. (AR 31.) Plaintiff stopped working because the jobs ended and not due to impairment related reasons. (AR 31.) Plaintiff testified that he returned to work in construction in 2010 and made $12,395. (AR 45-46.) He stopped working because the job ended. (AR 47.) Plaintiff returned to work again in 2011 and worked for the first three months of the year earning $9,596. (AR 47.) Plaintiff stopped working because there was no more work. (AR 48.) After Plaintiff was laid off he continued to try to return to work. (AR 64.) While Plaintiff alleged that he was disabled beginning January 2009 (AR 204), Plaintiff's ability to work in construction and his continued efforts to return to work are substantial evidence to support the ALJ's finding that at least at time's Plaintiff's daily activities were greater than he reported. Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) (affirming adverse credibility finding where ALJ identified evidence that undermined the claimant's complaints).

The ALJ also considered that Plaintiff made inconsistent statements about his alcohol use which the record demonstrated exacerbated his seizure disorder and increased the severity and frequency of his symptoms. (AR 31.) Plaintiff testified at the September 9, 2014 hearing that he stopped drinking in 2012, and does not drink anymore. (AR 31, 55.) He also told Dr. Vesali on April 22, 2013, that he stopped drinking in September 2012. (AR 31, 650.) But the record demonstrates that Plaintiff was consuming three cans of beer a week in March 2013. (AR 31, 618.) Further, review of the record demonstrates that Plaintiff told Dr. Yoshimura on July 2, 2013, that he quit drinking (AR 704); but told Nurse Practitioner Carmack on August 2, 2013, that he was drinking three cans of beer a week. (AR 714.) On October 16, 2013, Dr. Kirsten noted that Plaintiff was seen several weeks prior by Dr. Bonilla who observed Plaintiff's alcohol use on top of his traumatic brain injury. (AR 667.) Plaintiff was reported to have drunk a beer prior to having his seizure on May 26, 2014. (AR 746.) Substantial evidence in the record supports the ALJ's finding that Plaintiff made inconsistent statements about his alcohol use. Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (affirming credibility finding where ALJ pointed to several inconsistent statements regarding alcohol use).

Finally, the ALJ found that while Plaintiff alleged disability due to severe memory loss,

confusion, and forgetfulness secondary to his head injury and did appear disoriented and unable to answer questions at the hearing, he was able to describe his seizures and memory testing by the two consultative psychologists demonstrated he had a good memory and was able to perform simple and repetitive tasks without difficulty. (AR 33.) On May 4, 2012, Dr. Portnoff reported that Plaintiff's immediate memory was intact, he was able to recall 2 of 3 words after several minutes, and could remember autobiographical information. (AR 608.) Plaintiff was able to calculate change and could count backwards from 20. (AR 608.) On April 12, 2013, Dr. Swanson performed a consultative examination and found Plaintiff's short-term, recent, and remote memory were within normal limits and that his concentration and attention were satisfactory during the consultation. (AR 643, 646.) Review of Plaintiff's medical records since his seizures started generally demonstrate normal memory and concentration. (AR 362, 365-366, 404, 506, 527, 534, 553, 558, 651, 671, 675, 704,724, 872, 892, <u>but</u> <u>see</u> 395, 432, 470, 665, 899.) Substantial evidence supports the ALJ's finding that Plaintiff's statements regarding his memory loss, confusion and forgetfulness were contradicted by the findings in the medical record. <u>Molina</u>, 674 F.3d at 1113 (adverse credibility finding supported by medical evidence in the record).

The Court finds that the ALJ provided clear and convincing reasons for the adverse credibility finding that are supported by substantial evidence in the record.

**B.    Physician Opinions**

Plaintiff contends that the ALJ did not provide legally adequate reasons to reject the opinion of Plaintiff's treating neurologists, Drs. Yoshimura and Chaudhry, and his treating psychiatrist, Dr. Kirsten. Plaintiff further argues that the ALJ erred by failing to give reasons to reject part of Dr. Portnoff's opinion. Defendant counters that the ALJ properly considered the medical decisions in finding that Plaintiff was capable of restricted work at all exertion levels. Defendant argues that while Plaintiff seeks for the Court to interpret the evidence differently, the ALJ's determination was reasonable and supported by the evidence and should be upheld. Plaintiff responds that the ALJ failed to give "good reasons" to reject the opinions of the treating doctors and that Plaintiff's doctors are specialists and their opinions deserve more weight for that

reason.  Finally, Plaintiff argues that the failure to acknowledge the opinion of Dr. Kirsten was not harmless error and the failure to do so was reversible error.

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).  In general a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual."  Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted).  If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record.  Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir.) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

A treating physician's opinion is entitled to controlling weight on the issue of the nature and severity of the claimant's impairment where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  "If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.' "  Orn, 495 F.3d at 632 (citing 20 C.F.R. § 404.1527(d)(2).  "In that event, the ALJ is instructed by § 404.1527(d)(2) to consider the factors listed in § 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician."  Orn, 495 F.3d at 632.  The factors to be considered include the " '[l]ength of the treatment relationship and the frequency of examination' by the treating physician, the '[n]ature and extent of the treatment relationship' between the patient and the treating physician, the '[s]upportability' of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole.' "  Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1527(c)(2)-(6)).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  Ghanim, 763 F.3d at 1161 (quoting Orn, 495 F.3d at 631).

Where the treating physician's opinion is contradicted by the opinion of an examining

physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict. <u>Andrews</u>, 53 F.3d at 1041. However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record. <u>Id.</u>

The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. <u>Thomas</u>, 278 F.3d at 957. The doctors' opinions here are controverted so the ALJ needs to provide specific and legitimate reasons to reject the opinion.

### 1. Dr. Yoshimura

Plaintiff argues that the two reasons provided by the ALJ to reject Dr. Yoshimura's opinion are not inconsistent with Dr. Yoshimura's opinion. The ALJ must give specific and legitimate reasons to reject the contradicted opinion of the treating physician and can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence and stating his interpretation of the evidence and making findings. <u>Tommasetti</u>, 533 F.3d at 1041. Here, the ALJ set out a summary of Plaintiff's treatment and found that "[o]verall the medical evidence showed that [Plaintiff's] seizure disorder was stable and did not show greater limitation than the [] residual functional capacity." (AR 30.)

The ALJ noted that after Plaintiff had his traumatic brain injury, he was released to return to work on June 1, 2009, and was diagnosed with his first seizure on June 29, 2009, and started on anti-seizure medication. (AR 29, 486-503, 505-506.) Plaintiff subsequently received conservative treatment and medication for his seizure disorder. (AR 29.) The ALJ considered that the medical record showed that Plaintiff's alcohol use exacerbated his seizure disorder and increased the severity and frequency of his symptoms of seizure. (AR 31.) There is substantial

evidence in the medical record to support the ALJ's finding that Plaintiff's seizure disorder and symptoms were exacerbated by Plaintiff's use of alcohol. (AR 394, 578, 582, 585, 746.)

Plaintiff saw Dr. Yoshimura on July 1, 2009, and had a normal exam. (AR 506.) Dr. Yoshimura's impression was "Post traumatic seizure in patient with prior right frontal brain contusion. Normal now. Doubt underlying vascular neoplastic lesion. The occurrence, 6 months after initial trauma, suggests significant risk for continued occurrence." (AR 506.) Dr. Yoshimura agreed with Dilantin therapy, discussed the usual precautions, and placed Plaintiff off work for three months as he had no light duty option. (AR 506.)

Dr. Yoshimura saw Plaintiff again on August 26, 2009. (AR 508.) Plaintiff reported having no seizures and being compliant with his Dilantin. (AR 508.) Plaintiff did report some intermittent headaches. (AR 508.) Plaintiff had a normal exam, and Dr. Yoshimura noted that he would consider returning to work on October 1. (AR 508.)

Plaintiff next saw Dr. Yoshimura on January 13, 2010. (AR 514-515.) Plaintiff reported that he had no seizures but had a brief episode of confusion without a loss of consciousness. (AR 514.) Plaintiff reported being compliant with Dilantin and having intermittent headaches. (AR 514.) Plaintiff had a normal exam, but his Dilantin level was low at 8. (AR 515.) Dr. Yoshimura noted that there was no generalized reoccurrence although the episode was a little suspicious for a partial spell which may have been precipitated by the low Dilantin level. (AR 515.) Plaintiff's medication was increased and Dr. Yoshimura modified his work to allow no unprotected heights or work near machinery for two weeks. (AR 515.)

On February 8, 2010, Plaintiff reported having no spells, but mild fatigue. (AR 518.) His Dilantin level was 14. (AR 518.) On April 5, 2010, Plaintiff reported no seizures but he was feeling a little slow. (AR 521.) On April 7, 2010, Dr. Yoshimura noted that the Dilantin level was 18, and Plaintiff's medication was decreased. (AR 524.)

Plaintiff was next seen on May 17, 2010, and reported no seizures and no periods of confusion. (AR (AR 527.) Plaintiff stated that he was compliant with his Dilantin and his slowness and concentration were back to normal. (AR 29, 527.) Plaintiff reported continuing to have intermittent headaches. (AR 528.) Plaintiff's examination was normal; and Dr. Yoshimura

noted that there was no obvious generalized reoccurrence, and Plaintiff was doing well on current level.  (AR 528.)

On August 20, 2010, Plaintiff saw Dr. Yoshimura.  (AR 533.)  Plaintiff reported that he was having no spells while taking Dilantin, but was having some depressed mood and suicidal ideation.  (AR 533.)  Plaintiff also stated that he was talking on the phone and walking while he was upset and tripped and fell on his face.  (AR 533.)  He did not lose consciousness.  (AR 533.)  Plaintiff had a normal exam other than some facial abrasions from the fall.  (AR 533.)  Dr. Yoshimura noted that his seizures were well controlled with Dilantin.  (AR 533.)

On August 27, 2010, Plaintiff started chemical dependency treatment after receiving a second DUI.  (AR 369.)  Plaintiff reported that his drinking had escalated since his head injury and he was drinking two to three twenty-four ounce beers a day.  (AR 369.)  On August 30, 2010, Plaintiff reported that he was drinking about six beers per day but had not drank since he got his DUI on August 24, 2010.  (AR 394.)  Plaintiff stated he had a seizure the morning he was in jail after his DUI arrest.  (AR 394.)

On September 4, 2010, Plaintiff arrived for therapy and stated he did not feel right.  (AR 420.)  On September 7, 2010, Dr. Yoshimura noted that Plaintiff had a feeling of prodrome of seizure and was seen in the ER with a Dilantin level of 7.  (AR 29, 537.)  Plaintiff saw Dr. Yoshimura on September 20, 2010.  (AR 538-539.)  Plaintiff was complaining of a headache since the seizure incident.  (AR 538.)  Dr. Yoshimura noted that Plaintiff had a partial spell that was associated with low levels of Dilantin.  (AR 29, 538.)  A follow-up CT scan on September 24, 2010, showed stable encephalomalacia with no acute findings.  (AR 29, 544, 547.)

On November 18, 2010, Dr. Yoshimura noted that Plaintiff had a seizure on Labor Day weekend that was associated with low Dilantin levels and some chronic mood problems that are worse recently.  (AR 553.)  Other than some mild tandem ataxia, Plaintiff had a normal exam, and Dr. Yoshimura found that Plaintiff's seizures were still controlled with Dilantin.  (AR 553.)

Plaintiff saw Dr. Yoshimura again on January 31, 2011.  (AR 558.)  Plaintiff reported that he had a few brief spells of increased salivation with some anxiety.  (AR 558.)  He reported no loss of consciousness or "GTC" movements.  (AR 58.)  Plaintiff stated that he was compliant

with his Dilantin and had been sober for 137 days. (AR 558.) He also reported that his mood problems had been more stable. (AR 558.) Other than some mild tandem ataxia, Plaintiff had a normal exam, and Dr. Yoshimura found that Plaintiff's seizures were still controlled with Dilantin. (AR 558.)

On June 4, 2011, Plaintiff was taken to the hospital by ambulance and was having a seizure. (AR 564.) Plaintiff had been drinking and reported a headache and feeling "weird". (AR 565.) Plaintiff had two to three seizures with confusion, headache, and visual disturbances. (AR 567.) The possible causes for the seizures were noted to be sleep deprivation, missed seizure medication, and change in alcohol use. (AR 566.) The record notes that Plaintiff's seizure threshold had been lowered with alcohol. (AR 578.)

Plaintiff saw Dr. Yoshimura on June 28, 2011, and reported that he had started binge drinking again and had drank the night before his seizure. (AR 581.) He was drinking occasionally and no longer attending AA meetings. (AR 581.) Dr. Yoshimura noted that Plaintiff had seizures and it was a question whether they were post traumatic or alcohol related, more likely the latter. (AR 582.)

On September 20, 2011, Dr. Yoshimura notes that Plaintiff's Dilantin levels are therapeutic. (AR 584.) Plaintiff is not working because his job has no work. (AR 585.) Plaintiff claims good compliance with Dilantin. (AR 585.) Plaintiff stated he had a spell a couple weeks ago where he fell asleep watching television and found himself on the floor. (AR 585.) He had no tongue bite or incontinence, bruising, etc. (AR 585.) No clear "PIC". (AR 585.) Plaintiff had a normal examination, and Dr. Yoshimura found post traumatic seizures complicated by alcohol use. (AR 585.) It was unclear whether Plaintiff's recent event was a spell or not. (AR 585.)

On December 9, 2011, Plaintiff reported that his last spell was three weeks prior. (AR 588.) Plaintiff reported good compliance with his medication but his Dilantin level was 13. (AR 588.) His medication level was increased. (AR 588.) Plaintiff reported that he had decreased his alcohol usage and was only occasionally having a beer. (AR 588.) Dr. Yoshimura noted that Plaintiff's recent seizure was in setting of relatively low level and sleep deprivation. (AR 588.)

1  On December 20, 2011, Dr. Yoshimura noted that Plaintiff's Dilantin level was 21.  (AR 593.)

2  Plaintiff reported doing well on the current dose but feeling "like the batteries gone."  (AR 593.)

3  Plaintiff saw Dr. Yoshimura on February 22, 2012.  (AR 596.)  He reported that he had

4  stopped drinking since his last visit and had no seizures.  (AR 596.)

5  Plaintiff saw Dr. Yoshimura on March 4, 2013.  (AR 632.)  Plaintiff had moved out of

6  state and recently moved back.  (AR 632.)  Plaintiff reported no daytime seizures, but that he had

7  four episodes of sonorous respirations, diaphoresis while asleep.  (AR 632.)  Dr. Yoshimura

8  completed a seizure questionnaire on March 4, 2013.  (AR 29, 612-614.)  He reported that

9  Plaintiff had 2 daytime seizures during a 12 month period and no recent seizures during the 12

10 month period.  (AR 29, 613.)  Dr. Yoshimura said that Plaintiff has about 4 nocturnal seizures in

11 less than 6 months.  (AR 614.)  Dr. Yoshimura stated that Plaintiff has good compliance with his

12 medication and has the side effect of mild sedation.  (AR 614.)

13 On March 13, 2013, Dr. Yoshimura noted that Plaintiff's seizures are controlled.  (AR

14 689.)

15 On June 25, 2013, Plaintiff saw Dr. Yoshimura and reported having an episode the prior

16 day which he had mixed recall of.  (AR 701.)  He had some uncontrollable shaking without loss

17 of consciousness.  (AR 701.)  Plaintiff also reported some nocturnal spells and that he was

18 having problems with daily headaches.  (AR 701.)

19 On July 2, 2013, Plaintiff reported that he was taking his Dilantin and had stopped

20 drinking.  (AR 704.)  He reported some tenderness and was prescribed Neurontin.  (AR 704.)

21 On July 12, 2013, Plaintiff reported he was doing well with no seizures and improved headaches.

22 (AR 713.)

23 On August 2, 2013, Plaintiff saw nurse practitioner Carmack and stated he was having no

24 seizure activity.  (AR 713.)  He reported that he was drinking three cans of beer per week.  (AR

25 714.)  His examination was normal.  (AR 715.)

26 On September 16, 2013, Plaintiff saw Dr. Yoshimura.  (AR 724.)  He reported no recent

27 seizures but some uncontrollable shaking at times without loss of consciousness and some brief

28 time lapses.  (AR 724.)  Plaintiff also reported rare waking with wet sheets.  (AR 724.)  He stated

that he has quit drinking and has some mood deterioration which he attributes to the Neurontin. (AR 724.) Plaintiff was somewhat anxious but had a normal mental exam. (AR 724.) Dr. Yoshimura notes no blatant seizures but having some spells which are difficult to interpret given his behavioral issues. (AR 724.)

On September 19, 2013, Dr. Yoshimura completed a seizure questionnaire. (AR 657-658.) Dr. Yoshimura opined that during an 8 hour day Plaintiff is able to sit 8 hours, stand 2 hours, and walk 1 hour. (AR 657.) Plaintiff need not lie down or elevate his legs. (AR 657.) Plaintiff cannot drive, operate machinery or work at heights. (AR 657.) Plaintiff has complex partial seizures with occasional generalized spells up to daily. (AR 657.) Plaintiff is on mediation and has mood deterioration on Neurontin. (AR 658.) Plaintiff has confusion following his seizures that last up to hours. (AR 658.) Plaintiff generally needs to be inactive after his seizures. (AR 658.) This has been occurring since June 2013. (AR 658.)

On October 16, 2013, Dr. Kirsten noted that prior medication of Dilantin is only partly effective but he is unsure about compliance due to spaced refills. (AR 664.)

Plaintiff was next seen on June 4, 2014, when he was brought to the emergency room having seizures. (AR 735-790.) The record notes that the seizure was likely from medication noncompliance. (AR 29, 737.) His Dilantin bottle was empty and the record notes he might not have been taking his Dilantin. (AR 749.) Dr. Chaudhry noted that Plaintiff was not taking his Dilantin as evident by his Dilantin levels and had been drinking. (AR 742, 746.)

While in June 2013, Dr. Yoshimura opined that Plaintiff was unable to return to work, the ALJ found this opinion inconsistent with the medical record which showed that Plaintiff's condition improved in June 2013 after Plaintiff's sobriety from alcohol. (AR 31.) Further, Plaintiff's seizure in May 2014 which resulted in hospitalization was considered to be due to Plaintiff's noncompliance with medication. (AR 31.)

Plaintiff argues that the ALJ erred because Dr. Yoshimura expressed his opinion when blood tests proved that Plaintiff was compliant with his medication. However, Plaintiff's occasions of compliance which are demonstrated by appropriate medication levels also correspond to lack of seizure activity and Dr. Yoshimura's findings that Plaintiff's medication is

1  controlling his symptoms.  Specifically, Plaintiff points to four dates where his medication levels
2  were within the therapeutic range: December 2011, January 2012, March 2012, and August
3  2013.

4          On December 9, 2011, Plaintiff reported that his last spell was three weeks prior to the
5  visit.  (AR 588.)  His Dilantin level was 13 so his medication was increased.  (AR 588.)  Dr.
6  Yoshimura noted that his recent seizure was in the setting of relatively low level and sleep
7  deprivation.  (AR 588.)  On December 20, 2011, Plaintiff reported that he was doing well on his
8  medication although he felt like the "batteries were gone."  (AR 593.)

9          On February 22, 2012, Plaintiff reported that he had stopped drinking since his last visit
10  and he had no seizures.  (AR 596.)  His last seizure was prior to his December 20, 2011 visit.
11  (AR 596.)  There is no record of Plaintiff being seen again until after he moved back to Fresno
12  on March 4, 2013, when he reported that he had no seizures since August, but had four episodes
13  of sonorous respirations, diaphoresis while asleep.  (AR 632.)

14          In August 2013, Plaintiff reported that he had no seizure activity.  (AR 713.)  The Court
15  finds substantial evidence to support the ALJ's finding that Plaintiff's seizures were controlled
16  when he was compliant with his medication regimen.

17          Additionally, Plaintiff argues that Dr. Yoshimura stated in September 2013 that Plaintiff
18  had frequent partial complex seizures up to daily; however, the medical record does not support
19  the statement.  On June 2, 2013, Plaintiff reported one episode of some uncontrollable shaking
20  without loss of consciousness.  (AR 701.)  He reported no seizure activity in July and August.
21  (AR 704, 707, 713.)  On September 6, 2013, Plaintiff reported that he had no recent seizures, but
22  was having some uncontrollable shaking at times without loss of consciousness and some brief
23  time lapses and rare waking with moist sheets.  (AR 724.)  Contrary to Plaintiff's contention that
24  he was medication compliant at the time of his May 2014 seizure, the record demonstrates that
25  he showed up in the emergency room in May 2014 having seizures due to not being compliant
26  with his medication.  (AR 737, 742, 743.)  The record demonstrates that Plaintiff's condition did
27  improve after June 2013.

28          The Court finds that substantial evidence supports the ALJ's finding that Plaintiff's

seizures were exacerbated by alcoholism and controlled with sobriety and strict compliance with a medication regimen (AR 29, 515, 528, 533, 538, 553, 558, 566, 578, 582, 585, 588, 596, 689, 713, 724, 742), and that Plaintiff improved following his sobriety on June 13, 2013, (AR 704, 707, 715, 724.) The Court finds that the ALJ provided specific and legitimate reasons to reject Dr. Yoshimura's September 19, 2013 opinion.

### 2. Dr. Chaudhry

Plaintiff argues that the ALJ erred by rejecting Dr. Chaudhry's opinion that he was unable to work at any exertional level. While the ALJ must consider all medical evidence, "[t]he treating physician's opinion is not" "necessarily conclusive as to either physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). But the ALJ may not simply reject the treating physician's opinion on the ultimate issue of disability. Ghanim, 763 F.3d at 1154. To reject the contradicted opinion of the treating physician, the ALJ must provide specific and legitimate reasons that are supported by substantial evidence. Id.

On July 25, 2014, Dr. Chaudhry completed a questionnaire opining that Plaintiff had been unable to work due to his seizure disorder since May 25, 2014. (AR 897-898.) Dr. Chaudhry stated that Plaintiff's medical problems precluded him from working at any exertional level. (AR 897.) Plaintiff's primary impairment was his post traumatic seizure disorder. (AR 897.) This finding was based on uncontrolled seizures. (AR 897.) Dr. Chaudhry found that Plaintiff is at a risk of hurting himself in case of a seizure. (AR 897.) Dr. Chaudhry stated that Plaintiff has been compliant with medication and suffers no medication side effects. (AR 898.) Plaintiff has confusion and disorientation after a seizure, and his symptoms last for several hours. (AR 898.) Dr. Chaudhry was unsure what Plaintiff does after his seizures. (AR 898.) Dr. Chaudhry found that Plaintiff has been disabled since May 26, 2014. (AR 898.)

The ALJ considered that on July 25, 2014, Dr. Chaudhry opined that Plaintiff had been disabled since May 26, 2014, although Dr. Chaudhry was unsure about the frequency of Plaintiff's seizures. (AR 32.) In the opinion, Dr. Chaudhry stated that Plaintiff has generalized tonic clonic seizures and it is unknown how often Plaintiff has such seizures. (AR 897.)

The ALJ found that Dr. Chaudhry's finding that Plaintiff had been medication compliant

was inconsistent with the record.  (AR 32.)  As discussed above there is substantial evidence in the record that Plaintiff was not compliant with medication.  Dr. Chaudhry treated Plaintiff when he was brought to the hospital in June seizing uncontrollably and noted on June 28, 2014, that it was evident that Plaintiff was not taking his Dilantin based on his Dilantin level.  (AR 742.)

Further, other than reporting having one seizure in his sleep on June 4, 2014, (AR 872), Plaintiff reported no further seizures upon follow-up once he started back on his medication until September 10, 2014.  (AR 884, 892, 899.)  On September 10, 2014, Plaintiff reported no major seizures but he was having spells of shaking and becomes quiet and sleepy.  (AR 899.)  This was happening during the day and he was having night sweats.  (AR 899.)  Dr. Chaudhry opined that Plaintiff may be having partial seizures during the daytime and in his opinion it would not be safe for Plaintiff to return to work.  (AR 899.)

The ALJ also found that Dr. Chaudhry did not specify the amount of time that Plaintiff would be able to sit, stand, or walk in an eight-hour day and since Dr. Chaudhry did not set forth functional limitations this has limited value in determining Plaintiff's residual functional capacity.  (AR 32.)  In the questionnaire, Dr. Chaudhry did not indicate how long Plaintiff can sit, stand, or walk but wrote "uncontrolled seizure" and "abnormal MRI brain."  (AR 297.)  Dr. Chaudhry stated that Plaintiff must lie down due to risk of seizure but did not indicate how often or how long.  (AR 297.)

The ALJ also found Dr. Chaudhry's opinion inconsistent with the normal neurological examination of Plaintiff on September 10, 2014.  (AR 32.)  During the September 10, 2014, Dr. Chaudhry noted that Plaintiff was forgetful, but recorded an otherwise normal examination.  (AR 899.)  Plaintiff argues that Dr. Chaudhry based his opinion on the abnormal MRI results and not his examination.  However, as discussed, the record supports the ALJ's finding that despite the abnormal MRI results Plaintiff's seizures were well controlled when he was compliant with his medication and abstained from alcohol.

Finally, the ALJ gave little weight to Dr. Chaudhry's opinion that it would be unsafe for Plaintiff to go back to work because it appeared to refer to Plaintiff's past work in construction and had limited value in determining Plaintiff's residual functional capacity.  (AR 32, 899.)

While Plaintiff argues a different interpretation of the record and seeks to have the Court make different findings, the ALJ's interpretation of the record is reasonable and therefore must be upheld. Burch, 400 F.3d at 679. The Court finds that the ALJ provided specific and legitimate reasons to reject Dr. Chaudhry's opinion that are supported by substantial evidence in the record.

### 3. Mental Functional Capacity Findings

Plaintiff argues that the ALJ erred by failing to give any reason to reject the opinion of Dr. Kirsten and failing to provide reasons to reject portions of Dr. Portnoff's opinion.

**a. Dr. Portnoff**

Plaintiff argues that the ALJ erred by accepting Dr. Portnoff's opinion for some of the moderate limitations without providing reasons for rejecting other moderate limitations. Defendant responds that the ALJ need not specifically address every mild to moderate limitation opined by Dr. Portnoff and the ALJ properly synthesized Plaintiff's mental limitations into an RFC for simple, routine work.

Dr. Portnoff conducted a Comprehensive Psychiatric Exam of Plaintiff on May 4, 2012. (AR 606-610.) Plaintiff reported getting tonic-clonic seizures about twice a month with an aura of epigastric rising. (AR 606.) Plaintiff also reported apparent simple partial motor seizures, with isolated shaking in the legs and hands and complex partial seizures 3-4 times a week in which he will trance, stare upwards to the left, his arms will draw inwards and twist and he will repeat a phrase like "I don't know." (AR 606.) Sometimes these progress to full-blown tonic-clonic seizures. (AR 606.)

Plaintiff also reported tinnitus and change in taste since his trauma as well as hand eye incoordination and memory loss. (AR 606-607.) Plaintiff stated that he has more depression due to his losses and his wife reported he is more passive. (AR 607.) Plaintiff was still drinking one to two times per week. (AR 607.) Plaintiff does not need help with physical care. (AR 607.) He cannot shop or travel alone or handle money. (AR 607.) Plaintiff can prepare food for himself and describes a typical day as staying home and trying to keep busy. (AR 607.) Dr. Portnoff noted mild psychomotor tension, no abnormal movements, eye contact was good, and

facial kinetics was expressive.  (AR 607.)

Plaintiff's speech was spontaneous and prompt, moderately pressured but not loud.  (AR 608.)  Plaintiff's receptive language comprehension was grossly intact and thought process as reflected in speech were coherent but moderately rambling.  (AR 608.)  Plaintiff's thought content was appropriate to the situation.  (AR 608.)  Plaintiff described his mood as depressed and his affect was characterized by mild to moderate tense depression.  (AR 608.)  Plaintiff was oriented to time, place, and his immediate surroundings.  (AR 608.)

Plaintiff's immediate memory was intact and he was able to recall 2 of 3 words after several minutes.  (AR 608.)  Plaintiff was able to remember autobiographical information.  (AR 608.)  Plaintiff's fund of knowledge was good.  (AR 608.)  Plaintiff was able to perform simple math calculations.  (AR 608.)  Plaintiff could count backwards from 20.  (AR 608.)  Abstract thinking was intact.  (AR 608.)  Dr. Portnoff found Plaintiff's social judgment to be inadequate because in response to the questions what would he do if he were the first person in a movie theater to smell smoke or see fire, Plaintiff responded, "Yell fire."  (AR 608.)

Lurian frontal lobe tests were given and Plaintiff had no motor preservation in copying alternative figures but there was in bimanual alternating motions.  (AR 609.)  Plaintiff also had mild motor impulsiveness in response to conflicting verbal commands (go no-go).  (AR 609.)  Index finger tapping for 10 second trial was slow and the left had was disproportionate to the dominant hand.  (AR 609.)  There was no agraphesthesia in either hand for numbers traced into the palm.  (AR 609.)  Plaintiff had adequate insight into the fact of his psychiatric symptoms and need for treatment.  (AR 609.)

Plaintiff was found to have cognitive disorder due to head injury, and depressive disorder, and was assessed a Global Assessment of Functioning (GAF) of 55[2] (moderate

---

[2] "A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations."  Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed.2000)).  "A GAF score in the range of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or coworkers)."  Cornelison, 2011 WL 6001698, at 4 n.6 (citing  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34).

symptoms or impairment). (AR 609.) The advertence of eyes to the upper left quadrant during some of Plaintiff's latter seizures suggest some irritative lesion in the right premotor area, as does the diminishing left hand dexterity (although Plaintiff likely has diffuse brain dysfunction from his head injury). (AR 609.) Plaintiff problems with diminished taste may reflect a traumatic anosmia which would correspond with his mild tendencies for orbitofrontal dysfunction as suggested by the go no-go metrics. (AR 609.) Dr. Portnoff found that there was insufficient evidence to find that Plaintiff has developed a clinical frontal lobe organic personality disorder, although his tendency for passivity may partly reflect such tendencies as opposed to depressive byproducts. (AR 609.)

Plaintiff's prognosis for his depressive disorder was fair and for his cognitive disorder was poor due to the time since his injury. (AR 609.) Dr. Portnoff found it unclear whether there were any accumulative neuropsychological effects from an ongoing seizure disorder. (AR 609.)

Dr. Portnoff opined that Plaintiff was not capable of managing his own funds. (AR 610.) He would be able to perform simple repetitive tasks. (AR 610.) Plaintiff had moderate limitations in ability to perform detailed and complex tasks due to deficits in mental focus, and due to depression. (AR 610.) Plaintiff had moderate limitations in his ability to accept instructions from supervisors due to deficits in mental function and depression. (AR 610.) Plaintiff had moderate limitations in his ability to interact with coworkers and the public due to deficits in mental focus and depression. (AR 610.) Plaintiff had moderate limitations in his ability to work on a consistent basis without special or additional instruction. (AR 610.) Plaintiff had mild limitations in his ability to maintain regular attendance in the workplace from a psychiatric standpoint. (AR 610.) Plaintiff had moderate limitations in his ability to complete a normal workday or workweek without interruptions from a psychiatric condition due to affective/cognitive symptoms. (AR 610.) Plaintiff had moderate impairment in his ability to deal with stress encountered in a competitive work environment due to depression and reduced mental flexibility. (AR 610.)

The ALJ gave this opinion substantial weight because it was consistent with Plaintiff's ability to understand, remember, and carryout simple routine, and repetitive tasks using judgment

limited to simple work-related tasks. (AR 32.) Plaintiff does not argue that the ALJ failed to give legitimate reasons for the weight given to Dr. Portnoff's opinion, but that the ALJ failed to provide reasons to reject the other moderate limitations found by Dr. Portnoff.

While Plaintiff argues that the residual functional capacity assessment did not contain the moderate limitations opined by Dr. Portnoff, the residual functional capacity findings need not be identical to the relevant limitations but must be consistent with them. Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1223 (9th Cir. 2010). "[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008).

Defendant argues that the ALJ need not discuss every mild or moderate limitation opined by the doctor and that courts find that moderate limitations in pace are incorporated by limiting Plaintiff to simple, routine, repetitive work. Defendant relies upon Hoopai v. Astrue, 499 F.3d 1071 (9th Cir. 2007), in which the claimant was contesting the determination at step five arguing that the ALJ erred by assuming the role of the vocational expert. 499 F.3d at 1075. The Ninth Circuit found that they had "not previously held mild or moderate depression to be a sufficiently severe non-exertional limitation that significantly limits a claimant's ability to do work beyond the exertional limitation." Hoopai, 499 F.3d at 1077. Therefore, the appellate court held that substantial evidence supported the ALJ's conclusion that the claimant's "depression was not a sufficiently severe non-exertional limitation that prohibited the ALJ's reliance on the grids without the assistance of a vocational expert." Id.

However, in this instance, Dr. Portnoff opined that Plaintiff had moderate limitations in his ability to interact with the public and his coworkers and accept instructions from supervisors due to his mental deficits and depression. While the ALJ did not specifically address Plaintiff's ability in these areas in the residual functional capacity discussion, he did address Plaintiff's limitations in determining his severe impairments and found only mild limitations in social functioning. (AR 26.)

The ALJ found that Plaintiff had mild difficulties in daily living and social functioning

and moderate difficulties in concentration, persistence, and pace.  (AR 26.)  Specifically, the ALJ found that Plaintiff reported in his adult function report that he spent time with other people, went out alone, and got along with others.  (AR 26.)  Plaintiff reported on March 8, 2013, that he lives with friends (AR 297), goes outside daily (AR 300), goes grocery shopping once or twice a week (AR 300), spends time talking with other people once a week (AR 301), and tries to get along with others but has been told that he misunderstands a lot now after his injury (AR 303.)  The ALJ also found that Plaintiff lived with his girlfriend and attended AA meetings.  (AR 26.)  Plaintiff lived with Ms. Cunningham and her seventeen year old daughter.  (AR 81-82.)  He told Dr. Swanson that he was regularly attending AA meetings on April 12, 2013.  (AR 642.)  The record also demonstrates that Plaintiff attended and actively participated in group therapy and attended AA meetings at different periods throughout the relevant time period.  (AR 377-462, 585, 642.)  The ALJ considered the evidence in the record and gave reasons supported in the record to find that Plaintiff had only mild limitations in social functioning.

Further, the ALJ also gave substantial weight to the opinion of the state agency consultative psychiatrist Dr. Funkenstein who opined that Plaintiff was able to perform simple repetitive tasks on a consistent basis.  (AR 32.)  Plaintiff does not challenge the weight provided to the opinion of Dr. Funkenstein.

While the contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, "it may constitute substantial evidence when it is consistent with other independent evidence in the record."  Tonapetyan, 242 F.3d at 1149.  Dr. Funkenstein performed a case analysis and mental residual functional assessment on reconsideration.  (AR 106-119.)  Dr. Funkenstein noted that Plaintiff simply had a new consultative exam with IQ testing in the 70s which is consistent with simple, repetitive, tasks.  (AR 114.)  Dr. Funkenstein found that Plaintiff had mild restrictions in activities of daily living and difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, and pace.  (AR 115.)

Dr. Funkenstein was referring to the psychological assessment done by Dr. Swanson on April 12, 2013.  (AR 641-646.)  Dr. Swanson found Plaintiff to be cooperative but that he was

motivated to make a case for disability. (AR 643.) Plaintiff was oriented to person, place, time, and situation. (AR 643.) Dr. Swanson observed nothing atypical in Plaintiffs' gait or postural presentation. (AR 643.) He displayed average motor movement with no marked idiosyncrasies. (AR 643.) Speech was unremarkable and no speech peculiarities were observed. (AR 643.) Plaintiff exhibited a full range of affect that varied consonantly with speech content. (AR 643.)

Plaintiff's mood was euthymic[3] but became irritable when talking about missing his children. (AR 673.) Form and content of thought were within normal limits. (AR 643.) There was no evidence of delusional material present. (AR 643.) A disorder of perception was not in evidence and there was no evidence of psychosis. (AR 643.) Plaintiff had no suicidal or homicidal ideation. (AR 643.) Vegetative signs of depression were mostly absent. (AR 643.)

Dr. Swanson found that Plaintiff's short-term, recent, and remote memory were within normal limits. (AR 643.) Plaintiff had adequate abstraction ability in response to proverbs. (AR 643.) Plaintiff's concentration was adequate for performing simple, mathematical calculations. (AR 643.) Plaintiff's judgment and insight were deemed intact. (AR 643.) General fund of knowledge fell within normal limits. (AR 643.) Plaintiff maintained satisfactory attention and concentration and the results are considered a valid representation of his current functioning. (AR 644.) Dr. Swanson performed the Wechsler Adult Intelligence Scale which measured intellectual functioning, WMS-IV which assesses major dimensions of memory, Bender-Gestalt II which measures visual-motor integration skills, and TMT which tests visual, conceptual and visuomotor tracking. (AR 644-645.) Plaintiff was diagnosed with alcohol dependence, nicotine dependence, borderline intellectual functioning, and a GAF of 64.[4] (AR 646.)

Dr. Swanson opined that Plaintiff was able to maintain concentration and relate appropriately to others in a job setting. (AR 644.) He would be able to handle funds in his own best interests. (AR 644.) He could be expected to understand, carry out and remember simple instructions. (AR 646.) He was able to respond appropriately to usual work situations such as

---

[3] Moderation of mood, not manic or depressed. Stedman's Medical Dictionary 678 (28th Ed. 2006).

[4] A GAF score of 61 to 70 indicates mild symptoms or some difficulty in social, occupational, or school functioning. Macias v. Colvin, No. 1:15-CV-00107-SKO, 2016 WL 1224067, at *7 (E.D. Cal. Mar. 29, 2016).

attendance, safety and the like. (AR 646.) Changes in work routine would not be very problematic for him. (AR 646.) Dr. Swanson found there did not appear to be substantial restrictions in his daily activities, and difficulties in maintaining social relationships did not appear to be present. (AR 646.)

Dr. Swanson's opinion is consistent with Dr. Funkenstein's finding that Plaintiff has only mild difficulties in social functioning. Accordingly, Dr. Funkenstein's opinion is substantial evidence to support the ALJ's opinion that Plaintiff is capable of performing simple repetitive tasks and does not need limitations due to contact with co-workers or the public. Tonapetyan, 242 F.3d at 1149.

The Court finds that the ALJ provided legitimate and specific reasons which are supported by substantial evidence in the record to reject the opinion of Dr. Portnoff.

### b. Dr. Kirsten

Plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Kirsten and in failing to address Plaintiff's GAF scores. Defendant argues that the ALJ was not required to discuss Plaintiff's GAF scores, reliance on Dr. Portnoff's opinion is substantial evidence, and any error was harmless. Plaintiff responds that the failure to address Dr. Kirsten's opinion is not harmless and constitutes reversible legal error.

Where a claimant alleges that the ALJ failed to consider additional evidence, the harmless error rule applies. McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011). The reviewing court can determine from the "circumstances of the case" whether further administrative review is necessary to determine whether there was prejudice from the error. McLeod, 640 F.3d at 888. Mere probability of error is not enough. Id. "But where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether re-consideration is necessary. By contrast, where harmlessness is clear and not a borderline question, remand for reconsideration is not appropriate." Id. (internal punctuation and citations omitted).

The ALJ noted that Plaintiff received psychotherapy from October 2010 through December 2010 which showed consistently normal mental examinations and treatment for

alcohol dependence. (AR 29, 390-471.) Plaintiff also had consultative examinations by Drs. Portnoff and Swanson which the ALJ considered. (AR 29-30, 606-610, 643-646.) The ALJ noted that Plaintiff received limited mental health treatment from October 2013 through December 2013. (AR 30.) Dr. Kirsten[5] diagnosed Plaintiff with an organic mood disorder and cognitive disorder. (AR 30.) Plaintiff was seen approximately once a month for medication management. (AR 30.)

Dr. Kristen treated Plaintiff on three occasions: October 16, 2013, November 12, 2013, and December 10, 2013. (AR 664-675.) On October 16, 2013, Dr. Kirsten noted a difficult interview due to tangentially and emotionality of patient. (AR 667.) Plaintiff reported that he was currently completely sober and still having seizures. (AR 667.) Dr. Kirsten assessed Plaintiff with a GAF[6] of 41-50 serious symptoms. (AR 667.)

Plaintiff was alert, oriented, coherent, rational, and in acute distress. (AR 665.) Plaintiff looked dysphoric[7] somewhat anxious; and his affect was very poorly modulated. (AR 665.) Plaintiff's language was overproductive. (AR 665.) Speech was normal in volume and rate and there were no loose associations, no flight of ideas, no hallucinations or delusions. (AR 665.) Plaintiff's thoughts were not goal directed, tangential but logical. (AR 665.) Concentration ability was impaired. (AR 665.) There was no evidence of a movement disorder. (AR 665.) Plaintiff's short and long term memory were intact, and his fund of knowledge was excellent. (AR 665.) Plaintiff's judgment and insight were fair and impulse control was poor. (AR 665.)

Plaintiff next saw Dr. Kirsten for a routine medication visit on November 12, 2013. (AR 670-671.) Plaintiff reported doing somewhat better. (AR 670.) Plaintiff stated good compliance

---

[5] The Court notes that the ALJ and Defendant refer to Dr. Markham. Plaintiff was treated by Dr. Markham Kirsten and the Court finds that this was error in using the first name of the doctor and the opinion is referring to the treatment of Dr. Kirsten.

[6] A GAF range of 41–50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Vanbibber v. Carolyn, No. C13-546-RAJ, 2014 WL 29665, at *1 (W.D. Wash. Jan. 3, 2014) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders Multiaxial Assessment 30, 32 (4th ed. Text rev. 2000) (DSM-IV)).

[7] Mood of general dissatisfaction, restlessness, depression, and anxiety. Stedman's Medical Dictionary 599 (28th Ed. 2006).

29

with medication and no medication problems.  (AR 670.)  Plaintiff was alert, oriented, coherent, rational, and in acute distress.  (AR 671.)  Plaintiff looked dysphoric not anxious.  (AR 671.)  Plaintiff's affect was much better modulated.  (AR 671.)  Language was very fluent.  (AR 671.)  Speech was normal in volume and rate and there were no loose associations, no flight of ideas, no hallucinations or delusions; and thoughts were goal directed and logical.  (AR 671.)  Plaintiff's concentration ability and short and long term memory were intact.  (AR 671.)  Fund of knowledge was excellent.  (AR 671.)  Judgment, insight, and impulse control were fair.  (AR 671.)  Plaintiff was assessed with a GAF of 51-60.  (AR 671.)

Plaintiff was last seen on December 10, 2013.  (AR 674-675.)  Plaintiff reported that he was not doing well and medication was not controlling his negative thinking.  (AR 674.)  Plaintiff reported one or two seizures.  (AR 674.)  Plaintiff was alert, oriented, coherent, rational, and in acute distress.  (AR 675.)  He looked dysphoric not anxious.  (AR 675.)  His affect was poorly modulated and language was over productive.  (AR 675.)  Plaintiff's speech was normal in volume and rate.  (AR 675.)  There were no loose associations, no flight of ideas, no hallucinations or delusions; and thoughts were goal directed and logical.  (AR 675.)  Plaintiff's concentration ability and short and long term memory were intact.  (AR 675.) Plaintiff's fund of knowledge was excellent.  (AR 675.)  His judgment and insight were fairly good, and impulse control was fair.  (AR 675.)  Plaintiff was assessed with a GAF of 41-50.  (AR 675.)

The ALJ found that overall the medical evidence showed that Plaintiff could understand, remember, and carry-out simple routine, and repetitive tasks using judgment limited to simple work-related decisions without difficulty.  (AR 30.)  In coming to this opinion, he discussed the May 2012 consultative examination of Dr. Portnoff and the May 2013 state agency opinion.  (AR 32.)  The ALJ found that memory testing by the two consultative psychologists demonstrated that Plaintiff had a good memory and was able to perform simple and repetitive tasks without difficulty.  (AR 33.)

Although Plaintiff alleges the failure to address the GAF score is legal error, the Ninth Circuit has held in an unpublished opinion that it is not legal error to consider the GAF score where the RFC takes into account the claimant's mental impairments.  McFarland v. Astrue, 288

F.App'x 357, 359 (9th Cir. 2008)(unpublished).[8]  "The Commissioner has determined the GAF scale 'does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings.' "  McFarland, 288 F.App'x at 359 (quoting 65 Fed.Reg. 50,746, 50,765 (Aug. 21, 2000)).  However, GAF scores are relevant and may be considered by the ALJ in considering the claimant's general functional abilities.  Graham v. Astrue, 385 F.App'x 704, 706 (9th Cir. 2010).

Plaintiff argues that the ALJ rejected Dr. Kirsten's opinion that Plaintiff was having serious symptoms.  However, the ALJ considered that Plaintiff only received limited treatment over a three month period seeing Dr. Kirsten once a month.  (AR 30.)  The medical record shows that when Plaintiff first saw Dr. Kirsten he was in acute distress, and his concentration was impaired, judgment and insight were fair, and impulse control was poor.  (AR 665.)  On the last visit, Dr. Kirsten did find that Plaintiff was in acute distress and his affect was poorly modulated and his language over productive.  (AR 671.)  But, he also found that Plaintiff was oriented, coherent, and rational.  (AR 671.)  Plaintiff's ability to concentrate, and long term and short term memory were intact.  (AR 675.)  His fund of knowledge was excellent.  (AR 675.)  Plaintiff's judgment and insight were fairly good and impulse control was fair.  (AR 675.)  In considering the medical record, the ALJ determined that Plaintiff had an organic brain disorder and affective disorder but was able to understand; remember; and carry-out simple, routine, and repetitive tasks using judgment limited to simple work-related decisions.  (AR 30.)

This is not a situation such as that addressed in Marsh v. Colvin, 792 F.3d 1170 (9th Cir. 2015) where the treating physician noted that the claimant was pretty much non-functional, was not able to concentrate, and was disabled.  792 F.3d at 1171.  Here, Dr. Kirsten did not opine that Plaintiff had any functional limitations or find that Plaintiff's memory or concentration were impaired.  The ALJ considered that Dr. Kirsten only provided limited treatment.  While the ALJ did not specifically address the GAF finding or provide a weight to Dr. Kirsten's record, Dr.

---

[8] Unpublished dispositions and orders of this Court issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1.  Ninth Circuit Rule 36-3(b); see Animal Legal Def. Fund v. Veneman, 490 F.3d 725, 733 (9th Cir. 2007) ("as of January 1, 2007, we must now allow parties to cite even unpublished dispositions and unpublished orders as persuasive authority").

Kirsten included no functional limitations in his findings and those findings made by Dr. Kirsten are consistent with Plaintiff's ability to understand, remember, and carry out simple, routine and repetitive tasks using judgment limited to simple work-related decisions. In these circumstances of this case, the Court finds that any error in addressing Dr. Kirsten's opinion is harmless error.

    4.   <u>Lay Witness Testimony</u>

    **a.   Nancy Cunningham**

Plaintiff also alleges that the ALJ erred in failing to provide germane reasons to reject the testimony of Plaintiff's girlfriend, Nancy Cunningham. Defendant counters that the ALJ properly rejected Ms. Cunningham's testimony because it was inconsistent with the medical evidence which is a germane reason.

On March 5, 2013, Ms. Cunningham completed a third party function report. (AR 282-289.) Ms. Cunningham had known Plaintiff for three years and they lived together. (AR 282.) Ms. Cunningham stated that Plaintiff has no warning before he has a seizure. (AR 282.) Plaintiff's daily routine includes getting up, having coffee, taking his medication, reading the paper, taking naps, taking his medication again and going to bed about 10:00. (AR 282.) Plaintiff feeds the cat. (AR 283.) He does not sleep through the night, has seizures in his sleep, and wakes up with headaches and right ear pain. (AR 283.) Plaintiff has no problem with personal care. (AR 283.) He uses an am/pm container to take his medication. (AR 284.)

Plaintiff makes sandwiches and heats food in the microwave two to three times per week. (AR 284.) Plaintiff tries to help in the house but does not stay on task. (AR 284.) Plaintiff sometimes has to be reminded several times of what needs to be done and he fails to hear, understand, and retain. (AR 284.) Plaintiff goes outside every day but is unable to drive because his license is suspended. (AR 285.) He goes shopping with others for about 25 to 30 minutes every 1 to 2 weeks. (AR 284.) Plaintiff is able to handle his finances but he has no money. (AR 285.) Plaintiff reads on most days but falls asleep while reading. (AR 286.)

Ms. Cunningham stated that it is hard for Plaintiff to concentrate due to his head injury. (AR 286.) Plaintiff has to go somewhere with other people because he cannot drive, ride a bike or walk long periods. (AR 286.) He spends time with others and does not have any problem

getting along with others.  (AR 286-287.)  His social interaction is more limited now.  (AR 287.)  Plaintiff's injury affects standing, walking, hearing, climbing, memory, completing tasks, concentration, understanding, following instructions, and using his hands.  (AR 287.)  Plaintiff can walk 20 minutes and can pay attention for 20 minutes.  (AR 287.)  He can follow spoken instructions if repeated 2-3 times so he understands what is being asked of him and is able to do small simple instructions 1-2 times.  (AR 287.)  Plaintiff has difficulty controlling his emotions.  (AR 288.)  Plaintiff's medications cause him to be drowsy, thirsty, dizzy, confused, and to have slurred speech, headaches, and tingling in hands and feet.  (AR 289.)

On September 11, 2014, Ms. Cunningham wrote a letter stating that Plaintiff's seizures can be unpredictable.  (AR 317.)  Plaintiff can have one a week or a few throughout the day.  (AR 317.)  His seizures can be mild, strong, short, or long.  (AR 317.)  Plaintiff recently had a grand mal seizure on May 26, 2014, during which he was unconscious and unable to breath on his own.  (AR 317.)  Plaintiff does not know if he has had a seizure unless Ms. Cunningham tells him and she often does not let him know.  (AR 317.)  Plaintiff gets blank stares, disoriented look, shaking, dry mouth and drooling followed by major fatigue and sleepiness for hours afterward.  (AR 317.)

The ALJ considered Ms. Cunningham's statements and gave great weight to her description of Plaintiff's activities but found that her statement of his affected areas was inconsistent with the opinion of Dr. Vesali and Portnoff and was therefore given little weight.  (AR 33.)  In describing how Plaintiff's disability affects each of the areas checked in her third party function report, Ms. Cunningham stated that "Darin's head injury effected much of his fine motor skills as well as his retention and concentration for both memory, tasks, & understanding of such.  He is not able to travel in elevators or take on heights with any stability.  He is unstable when standing & walks short distances into objects."  (AR 287.)

Dr. Vesali completed a comprehensive neurological examination of Plaintiff on April 22, 2013.  (AR 650-653.)  Dr. Vesali found that Plaintiff was alert and spoke fluently in full sentences.  (AR 651.)  Plaintiff heard and answered questions appropriately and did not have any difficulty picking a paperclip up off the table.  (AR 651.)  Plaintiff walked with a normal gait.

(AR 651.) Tandem and Romberg were negative and finger-nose and heel-shin tests were normal. (AR 650.)

Spurling's and Speed's tests were negative bilaterally. (AR 652.) There was tenderness on the right hand, but otherwise no tenderness or inflammation in the bilateral upper extremities. (AR 652.) Plaintiff had normal muscle tone and bulk. (AR 652.) His strength was 5/5 in the upper and lower extremities including grip strength. (AR 652.)

Dr. Vesali opined that Plaintiff should be able to walk and stand 6 hours in an 8 hour day with normal breaks. (AR 653.) He had no limitation on sitting. (AR 653.) Plaintiff did not need an assistive device for ambulation. (AR 653.) Plaintiff should be able to lift/carry 20 pounds occasionally and 10 pounds frequently with the limitations due to a history of seizures. (AR 653.) Plaintiff can perform frequent postural activities due to chronic left ankle pain and had no manipulative limitations. (AR 653.) Plaintiff had limitations in driving a car, working around heavy machinery and chemicals, and extreme temperatures due to history of seizures. (AR 653.)

Dr. Vesali's report is substantial evidence that Plaintiff's injury has not affected his fine motor skills and that Plaintiff does not have difficulty standing or walking as described by Ms. Cunningham.

As discussed above, Dr. Portnoff found that Plaintiff's immediate memory was intact and he was able to recall 2 of 3 words after several minutes. (AR 608.) Plaintiff was able to remember autobiographical information. (AR 608.) Plaintiff's fund of knowledge was good. (AR 608.) Plaintiff was able to perform simple math calculations. (AR 608.) Plaintiff could count backwards from 20. (AR 608.) Abstract thinking was intact. (AR 608.) Plaintiff would be able to perform simple repetitive tasks. (AR 610.) Dr. Portnoff's opinion is substantial evidence to reject Ms. Cunningham's assessment that Plaintiff's retention and concentration for both memory, tasks, & understanding were impaired to the extent that he was unable to perform simple and repetitive tasks.

The Court finds that the ALJ provided germane reasons to reject Ms. Cunningham's testimony that are supported by substantial evidence in the record.

### b. Lou G. Azevedo

Plaintiff also asks the Court to consider third party evidence that the ALJ did not address because it was submitted after the ALJ issued his opinion.[9]  The Social Security regulations provide that the Appeal's Council will review a case if "the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."  20 C.F.R. § 404.970(a)(5).  Where a claimant submits additional material that the Appeals Council addressed in the context of denying the claimant's request for review, the district court must consider the additional material in deciding the claimant's Social Security appeal.  Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir. 1993); Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1162 (9th Cir. 2012).

In the record is a letter from Plaintiff's boss stating he observed several seizures and stopped hiring Plaintiff due to his insurer's concerns regarding safety.  On March 11, 2015, Lou Azevedo submitted a letter stating that Darin tried to work on three occasions but continued to suffer seizures.  (AR 319.)  Several times, Mr. Azevedo drove Plaintiff home from the jobsite because he was either having a seizure or was showing signs of seizure.  (AR 319.)  Plaintiff wants to return to work but Mr. Azevedo's insurance provider advised him not to hire Plaintiff because due to his medical condition he could cause injury to himself and others on the constructions site.  (AR 319.)  The appeals counsel considered this evidence and found that it did not provide a basis to change the Administrative Law Judge's decision.  (AR 2.)

Considering the record as a whole, the Court finds that Mr. Acevedo's letter does not change the finding that the ALJ's opinion is supported by substantial evidence.  First, the ALJ found and substantial evidence supports that Plaintiff suffered from a seizure disorder and that Plaintiff's seizures were well controlled when he was compliant with his medication.  Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.  Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d

---

[9] Plaintiff also references third party observations included in the medical record which have already been considered.

1001, 1006 (9th Cir. 2006). Mr. Azevedo's testimony does not reference any specific time frame or address Plaintiff's medication compliance at the time that he observed any seizure activity. The ALJ did not discount Plaintiff's testimony that he had seizures but the reason for the seizures.

Further, while Mr. Azevedo asserts that his insurance carrier advised him not to hire Plaintiff because he could be a danger on a construction site, the ALJ found that Plaintiff was unable to perform his previous work. Therefore, this testimony is consistent with the ALJ's opinion.

The Social Security Regulations provide that the Appeals Council will grant review of after received evidence where "there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.97(a)(5). The Court has considered the third party testimony of Mr. Azevedo in the context of reviewing the record as a whole to determine if substantial evidence supports the ALJ's decision. The testimony of Mr. Azevedo does not include any evidence that was not already considered by the ALJ at the time that he issued his decision. Therefore, the Court finds that substantial evidence supports the ALJ's findings.

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that the ALJ did not err in considering the medical opinion testimony of Drs. Yoshimura, Chaudhry, Kirsten, and Portnoff, and provided germane reasons to reject the testimony of Nancy Cunningham. Accordingly,

IT IS HEREBY RECOMMENDED that Plaintiff's appeal from the decision of the Commissioner of Social Security be DENIED; and Defendant's cross-motion for summary judgment be GRANTED.

This findings and recommendations is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within fourteen (14) days of service of this recommendation, any party may file written objections to this findings and recommendations with the Court and serve a copy on all parties. Such a document

should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**August 2, 2017**__

UNITED STATES MAGISTRATE JUDGE